IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:24-cr-0013 |
| v. | ) | |
| | ) | |
| MIGUEL ORR and ROMAINE BETTY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

APPEARANCES:

CHERRISSE R. WOODS, ESQ.
DELIA L. SMITH, ESQ.
ADAM FRANCIS SLEEPER, ESQ.
UNITED STATES ATTORNEY'S OFFICE
ST. THOMAS, U.S. VIRGIN ISLANDS
        FOR PLAINTIFF THE UNITED STATES OF AMERICA

KIA DANIELLE SEARS, ESQ.
MATTHEW A. CAMPBELL, ESQ.
OFFICE OF THE FEDERAL PUBLIC DEFENDER
ST. THOMAS, U.S. VIRGIN ISLANDS
        FOR DEFENDANT MIGUEL ORR

JENNIE ESPADA, ESQ.
SAN JUAN, PUERTO RICO
        FOR DEFENDANT ROMAINE BETTY

**<u>MEMORANDUM OPINION</u>**

**MOLLOY, Chief Judge.**

**BEFORE THE COURT** is Defendant Miguel Orr's ("Orr") Motion to Dismiss Counts One and Two of the Information, filed on July 15, 2024. (ECF No. 69.) Defendant Romaine Betty joined in Orr's motion to dismiss. (ECF No. 72.) The Government filed its opposition on July 29, 2024. (ECF No. 93.) On May 30, 2025, the Court held an omnibus hearing. For the reasons stated herein, the Court will deny Orr's Motion to Dismiss Counts One and Two.

*United States v. Miguel Orr and Romaine Betty*
Case No. 24-cr-0013
Memorandum Opinion
Page 2 of 22

## I.    FACTUAL AND PROCEDURAL HISTORY

The Court makes the following finding of fact based on information elicited at the omnibus hearing.

On April 30, 2024, the United States Coast Guard Cutter Resolute ("Resolute") was on patrol in international waters approximately fourteen (14) miles southwest of Haiti when its crew observed a 33-foot "go-fast"[1] boat traveling at a high rate of speed and carrying "unidentified packages" and fuel barrels on deck. The region of water that the Resolute was patrolling is known to be an area of high drug trafficking. Test. of Sean Sanchez, Omnibus Hr'g, May 30, 2025. At the time, the Resolute was on standby waiting to receive detainees in a prearranged transfer from the nearby U.S. Coast Guard Cutter Mohawk ("Mohawk"). *Id.*

The Mohawk uses a small vessel called Over the Horizon ("OTH") to transfer detainees to other large cutters, and while the OTH was enroute from the Mohawk to the Resolute with detainees aboard, its crew was alerted to the go-fast vessel. *Id.* The Mohawk was scheduled to make a pre-designated port call after transporting detainees to the Resolute, however, because the OTH was already "on the water," it delivered the detainees to the Resolute and then departed in pursuit of the go-fast vessel.[2] *Id.*

The OTH employed both lights and sirens while pursuing the go-fast vessel, and as the Coast Guard closed in, crew from both the Resolute and Mohawk observed persons on the go-fast "discarding packages" into the water. *Id.* When the go-fast vessel eventually came to a stop, the OTH came alongside it. *Id.* As the OTH approached, two of the Coast Guard crew displayed weapons drawn and "facing downward." *Id.* The four individuals on the go fast were told to put their hands on their head and to walk to the front of the boat. *Id.* Once it was clear to Coast Guard personnel that the crew were compliant, the weapons were holstered. *Id.*

---

[1] "Go-fast" boats—commonly outfitted with two outboard engines—are designed to outrun small boats. Test. of Sean Sanchez. "Coast Guard officials refer to such vessels as 'go-fast' boats because they can travel at high rates of speed, which makes them a favored vehicle for drug and alien smuggling operations." *United States v. Rendon*, 354 F.3d 1320, 1322 n.1 (11th Cir. 2003) (citing *United States v. Tinoco*, 304 F.3d 1088, 1092 (11th Cir. 2002)).

[2] Coast Guard protocol prohibits having detainees on board while at port because of flight risk. Test. of Sean Sanchez.

*United States v. Miguel Orr and Romaine Betty*
Case No. 24-cr-0013
Memorandum Opinion
Page 3 of 22

The Coast Guard then proceeded to conduct its "right of approach" protocol.[3] *Id.* (*See* Ex. 21.) The four go-fast crewmembers were later identified as Orr, Rayvon Smith, Romaine Betty, and Sherland Cambell. Orr stated that he was the master of the boat. *Id.* He also claimed that all four crewmembers were of Jamaican nationality and that the boat was of Jamaican nationality, as well. Test. of Sanchez.

The Coast Guard personnel coordinated and reported its interaction with the go-fast and its crew to District Seven in Florida—the Coast Guard district responsible for actions in the Caribbean Sea. *Id.* The Government of Jamaica was contacted and it neither confirmed nor denied the nationality of the vessel. *Id.* Accordingly, the Coast Guard exercised its authority to treat the vessel as one without nationality and enforce U.S. law. *Id.* During the right of approach process, Orr spontaneously confessed that the go-fast was carrying marijuana and that he had been forced at gunpoint to take the helm of the vessel in Jamaica. *Id.* After the crew of the go-fast was transferred to the OTH, Coast Guard personnel boarded the vessel and saw "white burlap sacks" similar to the ones that had been observed thrown overboard. *Id.* The contents of the sacks tested "presumptively positive" for marijuana and the four crew members were subsequently detained.[4] *Id.* Twenty-seven of the "packages" that had been thrown overboard were recovered from the water and another forty-seven "packages" were found on the deck of the vessel. *Id.* All tested positive for presumptive marijuana. *Id.* An estimated total of 3,736 pounds of marijuana was confiscated from the go fast, and the Coast Guard ultimately sunk the vessel "as a hazard to navigation." (ECF No. 1-1 Christopher Pastwik Aff. at ¶¶ 9, 10.)

---

[3] The "right of approach" refers to the Coast Guard's right to determine the nationality of a vessel on international waters. Test. of Sanchez. It is a doctrine of international maritime common law that bestows a nation's warship with the authority to hail and board an unidentified vessel to ascertain its nationality. *United States v. Williams*, 617 F.2d 1063, 1076, 1082 (5th Cir. 1980) (citations omitted). The "right of approach" is codified by article 22 of the U.N. Convention on the High Seas, *opened for signature* April 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 82. *Romero-Galue*, 757 F.2d at 1149 n.3 (citing *United States v. Postal*, 589 F.2d 862, 870 (5th Cir. 1979). The United States and Jamaica are signatories to the Convention.

[4] When the OTH initially requested permission from District Seven to treat the crew as detainees, permission was denied. Permission was subsequently given, and arrangements were made for the Resolute to receive the go-fast crew on board as detainees. Test. of Sanchez.

On August 7, 2024, a grand jury returned an indictment charging all four individuals on board the vessel with one count of conspiracy to possess a controlled substance with intent to distribute while on aboard a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a)(1), 70504(b)(2), 70506(a) and (b), and one count of possession of a controlled substance with intent to distribute while on board a vessel subject to the jurisdiction of the United States and aiding and abetting in violation of 46 U.S.C. §§ 70503(a)(1), 70504(b)(2), 70506(a) and Title 18 U.S.C. § 2.[5] (ECF No. 98.)

Orr filed the instant motion arguing that he is not properly charged under the Maritime Drug Law Enforcement Act (MDLEA) and that the United States does not have proper jurisdiction.

## II.    DISCUSSION

Congress enacted the MDLEA, codified as amended at 46 U.S.C. §§ 70501-70507, to prohibit any person from "knowingly or intentionally" possessing "with intent to manufacture or distribute, a controlled substance" on board "a vessel subject to the jurisdiction of the United States," 46 U.S.C. §§ 70503(a)(1),(e)(1), and from conspiring to do the same. 46 U.S.C. § 70506(b). Under the MDLEA "a vessel without nationality" is "a vessel subject to the jurisdiction of the United States." 46 U.S.C. § 70502(c)(1)(A). Orr was charged for trafficking illicit drugs aboard "a vessel without nationality" pursuant to the MDLEA. He sets forth several arguments in his defense but raises nothing novel. The Court addresses each in turn below.

### A. Orr's vessel was properly deemed "stateless."

Orr argues that under international law, his oral claim that his vessel was of Jamaican nationality should have sufficed to prevent the Coast Guard from designating the vessel as a stateless vessel thereby giving the United States jurisdiction over the vessel. The Government agrees that a master may establish claim of nationality by verbal claim but argues that section 70502(d)(1)(A)-(C) of the MDLEA establishes the criteria for determining whether a ship is

---

[5] On October 23, 2024, the Government filed the Superseding Indictment wherein the grand jury charged the defendants with the same charges but corrected the date that the Defendants were intercepted. (*See* ECF No. 124.)

a "vessel without nationality." (ECF No. 93 at 3,4.) Orr, on the other hand, relies solely on 46 U.S.C. § 70502(e)(3). (ECF No. 69 at 2,3.)

The MDLEA applies to individuals on board any vessel of the United States and any vessel subject to the jurisdiction of the United States—which includes any vessel "without nationality." 46 U.S.C. §§ 70503(e)(1), 70502(c)(1)(A). The MDLEA designates the following four ways in which a vessel may be deemed "without nationality," and therefore, stateless and subject to the jurisdiction of the United States:

> (A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
>
> (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel;
>
> (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality; and
>
> (D) a vessel aboard which no individual, on request of an officer of the United States authorized to enforce applicable provisions of United States law, claims to be the master or is identified as the individual in charge, and that has no other claim of nationality or registry under paragraph (1) or (2) of subsection (e).

46 U.S.C. § 70502(d)(1)(A)-(D).

According to testimony at the May 30, 2025 omnibus hearing, the Government of Jamaica neither confirmed nor denied nationality of the vessel at issue, therefore, pursuant to section 70502(d)(1)(c), the go-fast vessel was properly deemed stateless because Jamaica did not "affirmatively and unequivocally assert" that the vessel was of Jamaican nationality.

Orr contends that section 70502(e) of the MDLEA sets the course otherwise because Orr's verbal claim of nationality was not specifically "denied," and a verbal claim is one of the three ways section 70502(e) lists that a claim "of nationality or registry" under the MDLEA may be established:

> (1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas;
> (2) flying its nation's ensign or flag; or

> (3) *a verbal claim of nationality or registry by the master or individual in charge of the vessel.*

46 U.S.C. § 70502 (e) (emphasis added). This Court addressed this very argument in *United States v. McElroy-Carlos*, No. 2022-0011, 2023 U.S. Dist. LEXIS 117789, at *12 (D.V.I. July 10, 2023).[6] There, the Court stated: "International law provides that a vessel's initial showing of nationality—either by flag, papers, or oral assertion—constitutes only a prima facie showing of nationality, which may be overcome by 'contrary evidence.'" *Id.* (citation omitted). Therefore, it follows that international law "permits treating a vessel as stateless when its master makes a verbal claim of nationality that is *both* unsubstantiated *and* inconsistent with other relevant indicators of the vessel's nationality." *Id.* "Where surrounding facts provide legitimate reason to doubt an oral claim of nationality, international law would permit the United States to treat the vessel as stateless." *Id.*; *see also United States v. Marin*, 90 F.4th 1235, 1242-43 (9th Cir. 2024) (holding that section 70502(d)(1)(C) is not inconsistent with international law because no rule of international law provides that oral claims of nationality "can only be rebutted by a denial—rather than merely a failure to confirm or deny—by the claimed flag state").

Pursuant to section 70502(e)(3), a verbal claim could suffice for establishing nationality under the MDLEA, *if* the country of nationality substantiates the oral claim "affirmatively and unequivocally" according to section 70502(d)(1). Section 70502(e) does

---

[6] In *McElroy-Carlos*, the United States Coast Guard intercepted and searched the defendants' vessel in international waters. The vessel was not flying any flag at the time and was not registered to any country, but the three-man crew claimed Nicaraguan nationality for the vessel, which the Nicaraguan government was unable to confirm or deny when the United States inquired through the proper channels. Over 600 kilograms of cocaine and approximately 60 kilograms of marijuana were discovered onboard. The crew was arrested and taken to St. Croix for prosecution, where they were indicted for possession of a controlled substance with intent to distribute while on board a vessel subject to the jurisdiction of the United States, and conspiracy to do the same. Defendants unsuccessfully challenged whether section 70502(d)(1)(C) of the MDLEA permits the United States to exercise jurisdiction where the master of a vessel claims that the vessel is registered in a given nation, but the claimed nation of registry is unable to "unequivocally" confirm the vessel's nationality. §70502(d)(1)(C). *McElroy-Carlos*, 2023 U.S. Dist. LEXIS 117789, at *1-3.

not alone establish nationality of a vessel when the country of nationality asserted does not "affirmatively and unequivocally" back up the master's claim, as is the case here. To be sure, the MDLEA treats an oral claim and flying a flag as equivalent ways to claim nationality. *Id.* at §§ 70502(e)(2)-(3). But Orr does not cite a single reliable source that says an unsubstantiated oral claim of nationality also constitutes prima facie proof of nationality.[7] Orr relies heavily—"because of its sound reasoning"—on the vacated First Circuit case *United States v. Davila-Reyes*, 23 F.4th 153 (1st Cir. 2022). *See United States v. Davila-Reyes*, 38 F.4th 288, 288 (1st Cir. 2022) (vacating the January 20, 2022 decision). However, no matter how reasonable Orr finds *Davila-Reyes* to be, this Court previously determined it carries zero weight. *See United States v. Cuevas-Almonte*, Case No. 3:19-cr-0076, 2024 U.S. Dist. LEXIS 83743, at *7 (D.V.I. May 8, 2024)("Given the First Circuit's vacatur of the January 20, 2022 decision, and the Court of Appeals subsequent limited *en banc* decision, the *Davila-Reyes* case is of virtually no persuasive value."); *see also United States v. Canario-Vilomar*, 128 F.4th 1374, 1376-77 (11th Cir. 2025) (finding Congress was not constrained by international law in defining a "vessel without nationality" under the MDLEA.). Here, Orr's verbal claim of nationality may have sufficed had the Government of Jamaica substantiated his claim—but it did not. The Court finds Orr's argument unpersuasive and ineffectively redundant.

---

[7] Orr relies on *United States v. Maynard*, 888 F.2d 918 (1st Cir. 1989), and *United States v. Potes*, 880 F.2d 1475 (1st Cir. 1989). (*See* ECF No. 69 at 3.) Both are unpersuasive because neither is binding on this court, and both were decided before the MDLEA was amended in 1996 to incorporate the precursor to Section 70502(d)(1)(C). Among other changes, the amended MDLEA broadened the criteria for establishing jurisdiction over stateless vessels. Compare 46 U.S.C. § 1903 and 46 U.S.C. §70502. Orr also cites to *United States v. Matos-Luchi*, 627 F.3d 1, 5 (1st Cir. 2010). (ECF No. 69 at 5.) However, the court in *Matos-Luchi* stated that "although enforcement jurisdiction presumptively lies with the flag state, it is not enough that a vessel have a nationality; she must claim it and be in a position to provide evidence of it." *Matos-Luchi* at 6 (citation omitted). None of the crew members in *Matos-Luchi* made an affirmative claim of nationality for the vessel, nor did the vessel at issue fly a flag or carry registry papers issued by any state. The Court further opined that the "freedom of the open sea, whatever those words may connote, is a freedom of ships which fly, and are entitled to fly, the flag of a State. . . . In the interest of order on the open sea, a vessel not sailing under the maritime flag of a State enjoys no protection whatever. . . ." *Id.* (citations omitted). "The controlling question is whether at the point at which the authorities confront the vessel, it bears the insignia or papers of a national vessel or its master is prepared to make an affirmative and sustainable claim of nationality. To read the MDLEA more restrictively would mean that the master and crew need only carry no papers and jump overboard to avoid having their vessel classed as stateless." *Id.*

**1. Certification of the Government of Jamaica's response is conclusive.**

Orr also argues that evidence is lacking to prove that the Government of Jamaica rebutted his claim of nationality. The United States, in opposition, argues that the Certification it provided from the U.S. State Department suffices as conclusive evidence of Jamaica's response.[8] (*See* Ex. 21.)  Indeed, the MDLEA specifically states that Certification provided by the Government is conclusive evidence. 46 U.S.C. § 70502(d)(2) ("The response of a foreign nation to a claim of registry under paragraph (1)(A) or (C) may be made by radio, telephone, or similar oral or electronic means, *and is proved conclusively* by certification of the Secretary of State or the Secretary's designee.") (emphasis added); *see also United States v. Cardales-Luna*, 632 F.3d 731, 737 (1st Cir. 2011) ("Such a certification is conclusive and any further question about its legitimacy is a question of international law that can be raised only by the foreign nation.") (citation modified); *United States v. Campbell*, 743 F.3d 802, 806 (11th Cir. 2014) ("The [MDLEA] does not require the certification of the Secretary of State to include the details of how an official received or from whom the official received the response to a claim of registry from a foreign nation."); *United States v. Bustos-Useche*, 273 F.3d 622, 627 & n.5 (5th Cir. 2001) ("Consent or waiver of objection by the flag nation is conclusively proven by certification from the Secretary of State or the Secretary's designee.") The statute—in plain language—defeats Orr's argument here.

**2. Small vessels carrying illicit drugs are not protected.**

Orr next argues that small vessels are excluded from any requirement of registry pursuant to the United Nations Convention on the Law of the Seas, art. 94, § 2(a) and 46 U.S.C. §12102(b).[9] Orr avers that because the boat he was intercepted on was small in size, registry

---

[8] The Certification attests that "on or about April 30, 2024, under Article 14 of the Agreement between the Government of the United States of America and the Government of Jamaica Concerning Cooperation in Suppressing Illicit Maritime Drug Trafficking, the Government of the United States requested that the Government of Jamaica confirm or deny the vessel's registry and, if confirmed, grant authorization to board and search the vessel," and that on that same day, "the Government of Jamaica replied that it could neither confirm nor deny the vessel's registry or nationality." (Ex. 21.)

[9] Title 46, Section 12102 of the U.S. Code is titled "Vessels requiring documentation." The statute provides in relevant part that: "Except as otherwise provided, a vessel may engage in a trade only if the vessel has been issued a certificate of documentation with an endorsement for that trade under this chapter." 46 U.S.C. §12102(a). Section §12102(b) states that vessels of less than 5 net tons "may engage in a trade without being

*United States v. Miguel Orr and Romaine Betty*
Case No. 24-cr-0013
Memorandum Opinion
Page 9 of 22

was not required with the Government of Jamaica or any other country, and therefore the boat could not be deemed stateless. (ECF No. 69 at 7.) At the May 30, 2025 omnibus hearing, it was suggested that the go-fast boat was potentially a fishing vessel for which registration with the Jamaican government would not have been required. Orr essentially contends that the vessel could not be considered stateless if verification was not possible by the Government of Jamaica. (ECF No. 69 at 7.)

The United Nations Convention on the Law of the Sea (hereinafter UNCLOS) establishes a "comprehensive international legal framework to govern activities related to the global oceans."[10] Article 94 §2(a) of UNCLOS states that a flag State must maintain a register of ships that includes "the names and particulars of ships flying its flag," with the exception of ships "from generally accepted international regulations on account of their small size."[11] Art. 94 §2(a), Part VII. High Seas. Section 1. General Provision. Notwithstanding Article 94, it is worth noting that Article 108 calls on all states to cooperate in suppression of illicit traffic in narcotics. Art. 108, Part VII. High Seas. General Provision.[12]

---

documented if the vessel otherwise satisfies the requirements to engage in the particular trade." *Id.* at §12102(b).

[10] *See* United Nations Convention on the Law of the Sea of 10 December 1982. Overview and Full Text. https://www.un.org/depts/los/convention_agreements/convention_overview_convention.htm (last visited January 20, 2026).

[11] Article 94 of UNCLOS is entitled "Duties of the flag State" and provides that:
> 1. Every State shall effectively exercise its jurisdiction and control in administrative, technical and social matters over ships flying its flag.
> 2. In particular every State shall: (a) maintain a register of ships containing the names and particulars of ships flying its flag, except those which are excluded from generally accepted international regulations on account of their small size. . . .

U.N. Convention on the Law of the Sea art. 94, Dec. 10, 1982, 1833 U.N.T.S. 397.

[12] Entitled "Illicit traffic in narcotic drugs or psychotropic substances," Article 108 of UNCLOS states:
> 1. All States shall cooperate in the suppression of illicit traffic in narcotic drugs and psychotropic substances engaged in by ships on the high seas contrary to international conventions.
> 2. Any State which has reasonable grounds for believing that a ship flying its flag is engaged in illicit traffic in narcotic drugs or psychotropic substances may request the cooperation of other States to suppress such traffic.

U.N. Convention on the Law of the Sea art. 108, Dec. 10, 1982, 1833 U.N.T.S. 397.

*United States v. Miguel Orr and Romaine Betty*
Case No. 24-cr-0013
Memorandum Opinion
Page 10 of 22

Regardless of whether the vessel Orr was intercepted on was documented or not, Orr presents no authority that limits the international cooperation of states in the suppression of illicit traffic on the basis of a vessel's size. The United States alleges that Orr and his co-defendants were using the vessel for *illicit maritime drug trafficking*—exactly the illicit activity that the MDLEA targets and that the Government of Jamaica and the United States have agreed to cooperatively suppress. (*See* Ex. U.) *See United States v. Aybar-Ulloa*, 987 F.3d 1, 13 (1st Cir. 2021) (noting that its holding did not apply "to the large majority of vessels sailing on the high seas," but rather, it applied "only to vessels flouting order and custom on the high seas by eschewing the responsibilities and protections of the flag-state system"). Again, the Court finds that Orr's argument holds no water.

### B.    The MDLEA does not conflict with international law.

Orr haphazardly draws on doctrines of international law to assert that Congress did not intend for sections 70503(a)(1)[13] and 70506(b)[14] "to apply to the possession of illicit substances aboard a boat by Jamaican citizens traveling in international waters off of the coast of Haiti" without a showing of "intent to distribute in the United States." (ECF No. 69 at 16.)

To be clear, "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) (citing *McCulloch v. Sociedad Nacional de Mainero de Honduras*, 372 U.S. 10, 21 (1963)). Nonetheless, in shaping the reach of our criminal law, Congress is not constrained by international law. *United States v. Pinto-Mejia*, 720 F.2d 248, 259 (2d Cir. 1983) *(citing Rainey v. United States,* 232 U.S. 310, 316 (1914) and *Whitney v. Robertson,* 124 U.S. 190, 194 (1888)). "If it chooses to do so, it may legislate with respect to conduct outside the United

---

[13] "§ 70503. Prohibited Acts (a) Prohibitions. While on board a covered vessel, an individual may not knowingly or intentionally (1) manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance. . . ." 46 U.S.C. § 70503(a)(1).

[14] "§ 70506. Penalties . . . (b) Attempts and conspiracies. A person attempting or conspiring to violate section 70503 of this title [46 USCS § 70503] is subject to the same penalties as provided for violating section 70503 [46 USCS § 70503]." 46 U.S.C. § 70506(b).

*United States v. Miguel Orr and Romaine Betty*
Case No. 24-cr-0013
Memorandum Opinion
Page 11 of 22

States, in excess of the limits posed by international law."[15] *Yousef,* 327 F.3d at 86 (citations omitted). The Third Circuit does not recognize a conflict with international law.

### 1. Customary international law[16]

Customary international law is "[i]nternational law that derives from the practice of states and is accepted by them as legally binding." Black's Law Dictionary (12th ed. 2024).[17]

---

[15] Orr states that "'the law of nations' in contemporary terms means 'customary international law.'" (citing to *Bellaizac-Hurtado*, 700 F.3d at 1251). (ECF No. 69 at 8, 9.) However, customary international law is a *subset* of international law—just as treaties are a subset of international law. *See United States v. Dávila-Reyes*, 84 F.4th 400, 460 n.39 (1st Cir. 2023) ("[Customary international law] was also used as a broader term for international law, including treaties.") (citing Sarah H. Cleveland & William S. Dodge, *Defining and Punishing Offenses under Treaties*, 124 Yale L.J. 2202, 2206-07 (2015) (arguing that "Offences against the Law of Nations" includes treaty violations))). According to Black's Law Dictionary, it is "international law" that equates to "law of nations." Black's Law Dictionary defines international law as "the legal system governing the relationships between countries. . . also termed *law of nations*." INTERNATIONAL LAW, Black's Law Dictionary (12th ed. 2024) (citation modified). Customary international law, on the other hand, is defined as "International law that derives from the practice of states and is accepted by them as legally binding. This is one of the principal sources or building blocks of the international legal system." *Id. See also* CRIME AGAINST THE LAW OF NATIONS, Black's Law Dictionary (12th ed. 2024) ("1. A crime punishable under internationally prescribed criminal law or defined by an international convention and required to be made punishable under the criminal law of the member states; 2. A crime punishable under international law; an act that is internationally agreed to be of a criminal nature, such as genocide, piracy, or engaging in the slave trade. — Also termed crime against international law; offense against international law; offense against *the law of nations*.") (emphasis added).

[16] "The determination of what offenses violate customary international law is no simple task. Customary international law is discerned from myriad decisions made in numerous and varied international and domestic arenas. Furthermore, the relevant evidence of customary international law is widely dispersed and generally unfamiliar to lawyers and judges. These difficulties are compounded by the fact that customary international law —as the term itself implies—is created by the general customs and practices of nations and therefore does not stem from any single, definitive, readily-identifiable source. . . . Accordingly, in determining what offenses violate customary international law, courts must proceed with extraordinary care and restraint. In short, customary international law is composed only of those rules that States must universally abide by, or accede to, out of a sense of legal obligation and mutual concern. In order for a principle to become part of customary international law, States must universally abide by it. . . . [C]ustomary international law addresses only those wrongs that are of *mutual*, and not merely *several*, concern to States. . . . Even if certain conduct is universally proscribed by States in their domestic law, that fact is not necessarily significant or relevant for purposes of customary international law." *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 247-49 (2d Cir. 2003) (citation modified); *see Filartiga v. Pena-Irala*, 630 F.2d 876, 888 (2d Cir. 1980) (discussing that customary international law includes only "well-established, universally recognized norms of international law"); *see also Kadic v. Karadzic*, 70 F.3d 232, 238-39, 243 n.8 (2d Cir. 1995)(quoting *Filartiga*, 630 F.2d at 888) (addressing whether a principle had "ripened into *universally accepted* norms of international law"))."Customary international law is not static; thus, courts must interpret it as 'it has evolved and exists among the nations of the world today.'" *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 445 (D.N.J. 1999) (quoting *Kadic*, 70 F.3d at 238).

[17] International law is more broadly defined as "[t]he legal system governing the relationships between countries; more modernly, the law of international relations, embracing not only countries but also such participants as international organizations and individuals (such as those who invoke their human rights or commit war crimes)." INTERNATIONAL LAW, Black's Law Dictionary (12th ed. 2024).

*United States v. Miguel Orr and Romaine Betty*
Case No. 24-cr-0013
Memorandum Opinion
Page 12 of 22

Customary international law is one of the main sources of international law—which also includes treaty law. There are five bases under customary international law on which a state may exercise criminal jurisdiction over a citizen or non-citizen for acts committed outside of the prosecuting state. *Yousef*, 327 F.3d at 91 n.24. These five well-recognized bases of criminal jurisdiction are:

> (1) the "objective territorial principle," which provides for jurisdiction over conduct committed outside a state's borders that has, or is intended to have, a substantial effect within its territory;
> (2) the "nationality principle," which provides for jurisdiction over extraterritorial acts committed by a State's own citizen;
> (3) the "protective principle," which provides for jurisdiction over acts committed outside the state that harm the state's interests;
> (4) the "passive personality principle," which provides for jurisdiction over acts that harm a state's citizens abroad; and
> (5) the "universality principle," which provides for jurisdiction over extraterritorial acts by a citizen or non-citizen that are so heinous as to be universally condemned by all civilized nations.

*Id.*[18] The satisfaction of only one of these principles is required. *United States v. MacAllister*, 160 F.3d 1304, 1308 n.9 (11th Cir. 1998).

Orr contends that not one of these principles applies to the instant matter. According to Orr, "[n]one of the defendants are citizens of the United States, so the national principle does not apply. No American citizen was a victim, so the passive personality principle does not apply" and "drug trafficking is not one of the listed universally prescribed offenses," which knocks universal jurisdiction out as well. (ECF No. 69 at 16.) Orr further maintains that the protective principle does not apply because, he argues, his alleged conduct "was not directed against the security of the United States." *Id.* Orr provides no binding authority to support his position.

---

[18] *See also Wright-Barker*, 784 F.2d at 167 n.5 ("International law generally recognizes five theories of criminal jurisdiction: 1) territorial -- within the state's territorial borders; 2) nationality -- as applied to nationals, wherever located; 3) passive personality -- as applied to those who commit crimes against nationals, wherever located; 4) protective -- applied to acts that have a potentially adverse effect on the state's security and governmental interests, wherever committed; and 5) universal -- applied by any state to acts, wherever committed, regarded as heinous crimes.") (citation omitted).

The Government, on the other hand, argues that the protective principle actually does apply and cites to 46 U.S.C. § 70501(1) and *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999) (finding application of the MDLEA "consistent with the protective principle") (ECF No. 93 at 16.) The language is plain. Section 70501 states "Congress finds and declares that trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501.

As one court observed, an inquiry into international law is only necessary where congressional intent is unclear. *United States v. Norris*, 719 F. Supp. 2d 557, 567 (E.D. Pa. 2010) (citing *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993)) "Inasmuch as the trafficking of narcotics is condemned universally by law-abiding nations, we see no reason to conclude that it is 'fundamentally unfair' for Congress to provide for the punishment of persons apprehended with narcotics on the high seas." *Martinez-Hidalgo* at 1056. Congress has made clear in the MDLEA its intent to reach conduct outside of the United States. As such, there is no need to apply principles of international law because "[a]s long as Congress has indicated its intent to reach such conduct, a United States court is 'bound to follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment.'" *Yousef*, 327 F.3d at 86 (citation omitted).

Moreover, courts have specifically addressed both the protective and universal principles in correlation with objectives of the MDLEA.

### a. Protective Principle

Reliance upon the protective principle under the instant scenario is not novel:

Indeed, the protective principle was the basis Congress cited for the Anti-Smuggling Act. S.Rep. No. 1036, 74th Cong. 1st Sess. 5 (1935). The Senate Report to that legislation noted that 'there is no fixed rule among the customs and usages of nations which prescribes the limits of jurisdictional waters other than the rule of reasonableness, that a nation may exercise authority upon the high seas to such an extent and to so great a distance as is reasonable and necessary to protect itself and its citizens from injury. *Id.*[19]

---

[19] *See* Anti-Smuggling Act of 1935 (19 U.S.C. §§ 1701-1711 (1982)).

*United States v. Miguel Orr and Romaine Betty*
Case No. 24-cr-0013
Memorandum Opinion
Page 14 of 22

*United States v. Gonzalez*, 776 F.2d 931, 939 (11th Cir. 1985).

By virtue of the protective principle a state "has jurisdiction to prescribe a rule of law attaching legal consequences to conduct outside its territory that threatens its security as a state or the operation of its governmental functions, provided the conduct is generally recognized as a crime under the law of states that have reasonably developed legal systems." *United States v. Pizzarusso*, 388 F.2d 8, 10 (2d Cir. 1968) (citing Restatement (Second), Foreign Relations, Section 33 (1965) and finding that drug trafficking may be prevented under the protective principle of jurisdiction, without any showing of an actual effect on the United States), *cert. denied*, 392 U.S. 936 (1968).

Although the Third Circuit has acknowledged that "international agreements have yet to recognize drug smuggling as a threat to a nation's 'security as a state or the operations of its governmental functions,'" the Court in *United States v. Wright-Barker* also stated that arguably, the protective and universal principles could apply.[20] *Wright-Barker*, 784 F.2d 161, 167 n.5 (3d Cir. 1986). "Even absent a treaty or arrangement," the Eleventh Circuit has held, "the United States could, under the 'protective principle' of international law, prosecute foreign nationals on foreign vessels on the high seas for possession of narcotics." *United States v. Hurtado*, 89 F.4th 881, 885 (11th Cir. 2023) (citation omitted); *see also United States v. Vilches-Navarrete*, 523 F.3d 1, 21-22 (1st Cir. 2008) (discussing the protective principle in the context of jurisdiction over a vessel on the high seas), *cert. denied*, 555 U.S. 897 (2008); *United States v. Peterson*, 812 F.2d 486, 493-94 (9th Cir. 1987) (Kennedy, J.) ("[D]rug

---

[20] In *Wright-Barker*, Defendants sought a review of judgments convicting them of various drug offenses, including possession of marijuana with intent to distribute after the foreign ship they were aboard was searched by the U.S. Coast Guard. The ship was of Panamanian registry. "The incident occurred in the North Atlantic, approximately 200 miles east of the New Jersey coast. A search of [the ship] uncovered over 23 tons of marijuana carefully secreted in the cargo hold. The ship's captain and ten crew members, citizens of countries other than the United States were placed under arrest, indicted and subsequently convicted." *Wright-Barker* at 166. The court affirmed judgments of the lower court and held that the lower court properly asserted jurisdiction over defendants because the criminal activity was intended to have an effect inside of the United States— although defendants' efforts were thwarted by the U.S. Coast Guard. *Id. at* 165. The Court stated that "[t]he acts at issue occurred on the high seas, over which no nation may assert territorial jurisdiction. However, Congress may assert extraterritorial jurisdiction over violations of United States law, so long as such jurisdiction does not abridge constitutional provisions or this nation's international agreements." *Id.* at 166. "Coast Guard power to board, search, seize, and make arrests on vessels on the high seas also turns on whether American laws apply there, since its statutory authority is limited to 'the prevention, detection, and suppression of violations of laws of the United States.' 14 U.S.C. § 89(a) (1982)." *Id.* at n.3.

trafficking may be prevented under the protective principle of jurisdiction, without any showing of an actual effect on the United States. . . . Protective jurisdiction is proper if the activity threatens the security or governmental functions of the United States. . . . Drug trafficking presents the sort of threat to our nation's ability to function that merits application of the protective principle of jurisdiction.") (citations omitted); *Gonzalez*, 776 F.2d at 939 ("The protective principle does not require that there be proof of an actual or intended effect inside the United States. The conduct may be forbidden if it has a potentially adverse effect and is generally recognized as a crime by nations that have reasonably developed legal systems.")(citations omitted). The protective principle is not as easily dismissed as Orr purports.

### b. Universal Jurisdiction

Universal jurisdiction is defined as "the power of a nation to assert jurisdiction over someone accused of a crime that violates international law, such as a war crime, genocide, or torture, regardless of where the crime occurred or of the accused person's citizenship, residence, or other relation to the prosecuting nation." Black's Law Dictionary (12th ed. 2024). Under the doctrine, "a nation may prosecute certain serious offenses even though they have no nexus to its territory or its nationals." *Cardales-Luna*, 632 F.3d at 740. As mentioned above, the Court in *United States v. Wright-Barker* acknowledged that international agreements have not recognized drug smuggling "as a heinous crime subject to universal jurisdiction," but the court did opine that "arguably," the universal theory could apply. *Wright-Barker*, F.2d 784 at 167 n.5.

Orr contends that drug trafficking is not a universal jurisdiction offense under international law and specifically argues that the MDLEA is an invalid exercise of Congress' Article I powers because drug trafficking is not a piracy claim. (ECF No. 69 at 8 to 11.)

"The historical restriction of universal jurisdiction to piracy, war crimes, and crimes against humanity demonstrates that universal jurisdiction arises under customary international law only where crimes are universally condemned by the community of nations, and by their nature occur either outside of a state or where there is no state capable

of punishing, or competent to punish, the crime (as in a time of war)." *Yousef*, 327 F.3d at 105 (2d Cir. 2003).[21]

Neither party here relies upon universal jurisdiction for application of the MDLEA.[22] However, the Court notes there exists a universally shared opinion among states in condemning illicit maritime drug trafficking and that "[n]othing in international law prohibits two nations from entering into a treaty, which may be amended by other arrangement, to extend the customs waters and the reach of the domestic law of one of the nations into the high seas." *See Romero-Galue*, 757 F.2d 1147, 1154 (11th Cir. 1985); *see also Yousef*, 327 F.3d at 75 ("A country's treaty obligations can supersede the general norms of customary international law for the purpose of determining which questions of nationality fall within the domain reserve of a state. If two or more states have unequivocally agreed to something by treaty, in relation to the matter in hand nothing other than the treaty has much relevance."). Orr cites no authority to the contrary. Furthermore, in 1997, the Government of Jamaica and the Government of the United States signed the bilateral Agreement Concerning Cooperation in Suppressing Illicit Maritime Drug Trafficking, Jam.-U.S., May 6, 1997, T.I.A.S. No. 98-310. (*See* generally Ex. U.) "Treaty law may provide a basis for a State's action independent of the principles of customary international law. A treaty creates obligations in States parties to it that may differ from those of customary international law, and it generally is immaterial whether customary international law points in the same or in a different direction than the treaty obligation." *Yousef*, 327 F.3d at 94.

As mentioned earlier, UNCLOS addresses illicit trafficking of narcotic drugs and provides that "[a]ll States shall cooperate in the suppression of illicit traffic in narcotic drugs

---

[21] As to universal jurisdiction, "no source of customary international law has designated drug trafficking as being subject to universal jurisdiction. The academic community is in accord that drug trafficking is not considered a universal jurisdiction offense." *Bellaizac-Hurtado*, 700 F.3d at 1260-61. "Indeed, several courts of appeals have held that drug trafficking is not a universal jurisdiction offense." *Id.* Only the "so-called *jus cogens* crimes of 'piracy, slavery and slave-related practices, war crimes, crimes against humanity, genocide, apartheid, and torture' are identified as supporting universal jurisdiction." *Id.* (citation omitted.)

[22] The Government asserts that "nothing in the text of the MDLEA expressly incorporates such principles," that Congress specifically provides for extraterritorial application of the MDLEA in the statute, and Congress is not prohibited from overriding international law. (ECF No. 93 at 21.)

and psychotropic substances engaged in by ships on the high seas contrary to international conventions." UNCLOS Art. 108. Since the enactment of the MDLEA, the United States has successfully negotiated bilateral agreements with Caribbean and Latin American countries that implement the MDLEA "in various degrees and forms allowing the enforcement of American criminal laws aboard foreign vessels, with the prior approval of the national government in question." *Cardales-Luna*, 632 F.3d at 742. The United States Coast Guard maintains more than 46 bilateral agreements and operational procedures with partner nations, "focused on countering illicit transnational maritime activities," which enable U.S. law enforcement to "board suspect trafficking vessels on the high seas to deter and disrupt illicit maritime trafficking." U.S. Dep't. of State, Bureau of Int'l Narcotics and Law Enforcement Affairs, Narcotics Control Strategy Report, March 2025, available at https://www.state.gov/2025-international-narcotics-control-strategy-report (last visited January 22, 2026). International agreements, such as the 1988 U.N. Drug Convention,[23] U.N. Single Drug Convention,[24] and the U.N. Psychotropic Substances Convention[25] demonstrate the international community's unified recognition of drug trafficking as criminal behavior. Illicit drug trafficking is vigorously and uniformly condemned by the international community and "[b]y virtue of its extraterritorial application, the MDLEA is 'frequently used to combat drug trafficking across foreign and international waters.'" *McElroy-Carlos,* 2023 U.S. Dist. LEXIS 117789 at *4 (citing *United States v. Mendoza*, No. 21-1087, 2022 U.S. App. LEXIS 5954, at *1 (3d Cir. Mar. 8, 2022). The United States and Jamaica have clearly agreed to cooperate in this effort. (*See* Ex. U.) While bi-lateral agreements do not create "universal jurisdiction" since "they create obligations only in States parties to them and not universally in all states," their purpose is to assure universal punishment of the offenses in question by denying perpetrators refuge in all States.

---

[23] U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, *opened for signature* Dec. 20, 1988, 1582 U.N.T.S. 95.

[24] U.N. Single Convention on Narcotic Drugs, 1961 (as amended by the 1972 Protocol), 976 U.N.T.S. 105.

[25] U.N. Convention on Psychotropic Substances, *opened for signature* Feb. 21, 1971, 1019 U.N.T.S. 175.

*United States v. Miguel Orr and Romaine Betty*
Case No. 24-cr-0013
Memorandum Opinion
Page 18 of 22

C.    **Only a foreign nation may invoke international law to challenge enforcement of the MDLEA.**

Relying on Ninth Circuit precedent and other non-binding sources, Orr challenges the MDLEA under international law. To begin with, the Third Circuit has already established that "[a] claim of failure to comply with international law in the enforcement of [MDLEA] may be invoked solely by a foreign nation." *Martinez-Hidalgo*, 993 F.2d at 1056; *see also Canario-Vilomar*, 128 F.4th at 1376 ("A person charged with violating the [MDLEA] does not have standing to raise a claim of failure to comply with international law as a basis for defense. Such a claim may be made only by a foreign nation. . . . Any dispute over the United States' compliance with international law in obtaining MDLEA jurisdiction should be resolved between nations in the international arena, not between criminal defendants and the United States in the U.S. criminal justice system.") (citation modified). The statute itself states that "a failure to comply with international law does not divest a court of jurisdiction and is not a defense to a proceeding under [the MDLEA]." 46 U.S.C. § 70505. Furthermore, as mentioned earlier, the Third Circuit and other courts recognize that Congress may override international law if Congress "clearly express[es] its intent to do so." *Martinez-Hidalgo*, 993 F.2d at 1056; *see also Pasquantino v. United States*, 544 U.S. 349, 379 (2005) (J. Ginsburg, dissenting) (noting that Congress "has the sole authority to determine the extraterritorial reach of domestic laws").[26] The language of the MDLEA is clear: Orr "does not have standing to raise a claim of failure to comply with international law as a basis for a defense." 46 U.S.C. § 70505.

D.    **Congress' authority is not exceeded under Article I.**

In challenging Congress' authority under the Define and Punish Clause, Orr raises yet another argument this Court addressed in *Cuevas-Almonte*. Orr contends that drug smuggling "cannot be punished under Congress's power to 'define and punish' piracies or felonies." (ECF No. 69 at 8 to 11.).

---

[26] The Supreme Court has also stated in *The Nereide*, 13 U.S. (9 Cranch) 388, 423 (1815) that while courts are "bound by the law of nations which is a part of the law of the land," Congress may "manifest [its] will" to apply a different rule "by passing an act for the purpose." *Id.* This principle was reaffirmed in *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10 (1963). Congress may enact laws superseding "the law of nations" if "the affirmative intention of the Congress [is] clearly expressed." *Id.* at 21-22.

*United States v. Miguel Orr and Romaine Betty*
Case No. 24-cr-0013
Memorandum Opinion
Page 19 of 22

To begin with, Article I, § 8, cl. 10 of the Constitution grants Congress power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." The Supreme Court has interpreted Clause 10 to contain "three distinct grants of power: 1) to define and punish piracies, 2) to define and punish felonies committed on the high seas, and 3) to define and punish offenses against the law of nations." *United States v. Cabezas-Montano*, 949 F.3d 567, 586 (11th Cir. 2020) (citation modified); *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 158-59 (1820). These are often referred to as 1) the Piracies Clause, 2) the Felonies Clause and 3) the Offenses Clause.

Orr's argument is not a new one. As this Court noted in *Cuevas-Almonte,* "the Third Circuit has already concluded that the MDLEA provision was properly enacted pursuant to the Piracies and Felonies clause of the Constitution. . . . Congress needed no other constitutional authority to enact the statutory provision in question." 2024 U.S. Dist. LEXIS 83743 at *13 (citing *United States v. Ledesma-Cuesta*, 347 F.3d 527, 531-32 (3d Cir. 2003) ("Congress had authority to enact [the MDLEA] pursuant to its constitutional power to[] 'define and punish Piracies and Felonies committed on the high seas, and Offenses against the Law of Nations.'" (quoting *Martinez-Hidalgo*, 993 F.2d at 1056 (quoting U.S. Const. art. 1, § 8, cl. 10)) (internal quotation marks omitted))); *see also Canario-Vilomar*, 128 F.4th 1374, 1376 ("The Felonies Clause of the U.S. Constitution empowers Congress to define and punish Felonies committed on the high seas."). The court in *Canario-Vilomar* reasoned that the plain language of the Felonies Clause does not incorporate any limitations from international law, unlike the Offenses Clause which explicitly refers to "the Law of Nations." *Id.* at 1380.

As the Government points out, "Clause Ten references international law ("Law of Nations") in the Offenses Clause but not in the Felonies Clause." (ECF No. 93 at 6.) Furthermore, according to the Supreme Court in *Smith*, 18 U.S. (5 Wheat.) at 159, the term "Felonies" had no settled meaning at the Founding that was tied to international law.[27] *See*

---

[27] "[T]he definition of piracies might have been left without inconvenience to the law of nations, though a legislative definition of them is to be found in most municipal codes. But the power is also given "to define and punish felonies on the high seas, and offences against the law of nations." The term "felonies," has been supposed in the same work, not to have a very exact and determinate meaning in relation to offences at the common law committed within the body of a county. However, this may be, in relation to offences on the high seas, it is necessarily somewhat indeterminate, since the term is not used in the criminal jurisprudence of the admiralty in the technical sense of the common law. Offences, too, against the law of nations, cannot, with any

*Campbell*, 743 F.3d at 810-11 (chronicling the ambiguities in the meaning of "felony" at the Founding). *See also Bellaizac-Hurtado*, 700 F.3d 1245, 1247 (11th Cir. 2012) ("[C]ourts have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause.")[28]

In its recent precedential opinion *United States v. Munoz*, the Third Circuit distinguished between the Felonies Clause and the Offense Clause, holding that MDLEA's application to drug trafficking on stateless vessels in international waters is constitutional under Congress's Felonies Clause power—even if international law might not recognize such jurisdiction—because the Felonies Clause does not incorporate international law limitations. "While the Offenses Clause refers to international law (*i.e.*, the Law of Nations), the Felonies Clause does not." *United States v. Munoz*, 2026 U.S. App. LEXIS 177 at *5-6, __ F.4th __ (3d Cir. Jan. 6, 2026). Congress used the power granted to it under the Felonies Clause to enact the MDLEA. *Id.* at *5. Accordingly, Orr's argument provides no basis for relief.

E.    **Orr's rights to Due Process are not violated.**

Orr raises another not-so-novel argument in asserting that the MDLEA violates his due process rights because, he argues, his alleged conduct lacks a nexus to the United States. (ECF No. 69 at 16.)  As this Court concluded in *United States v. Cuevas-Almonte,* "the Third Circuit along with other federal court of appeals have rejected such contentions."[29]  2024 U.S. Dist. LEXIS 83743, at *11 (D.V.I. May 8, 2024); *see e.g., Martinez-Hidalgo*, 993 F.2d at 1056 (3d Cir. 1993) ("We see nothing fundamentally unfair in applying the MDLEA exactly

---

accuracy, be said to be completely ascertained and defined in any public code recognized by the common consent of nations. In respect, therefore, as well to felonies on the high seas as to offences against the law of nations, there is a peculiar fitness in giving the power to define as well as to punish; and there is not the slightest reason to doubt that this consideration had very great weight in producing the phraseology in question." *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 158-59 (1820).

[28] The *Bellaizac-Hurtado* court held that "[t]he power granted to Congress in the Offences Clause is limited by customary international law." 700 F.3d at 1249.

[29] Although the Third Circuit has held that the government need not establish a domestic nexus to prosecute offenses, the Ninth Circuit has held that to apply the statute extraterritorially "consistently with due process, there must be a sufficient nexus between the defendant and the United States so that such application would not be arbitrary or fundamentally unfair." *See United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990); *but see United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993) (refuting the reasoning in *Davis*).

as Congress intended—extraterritorially without regard for a nexus between a defendant's conduct and the United States.")(citation modified).[30] "Jurisdiction exists solely as a consequence of the vessel's status as stateless. Such status makes the vessel subject to action by all nations proscribing certain activities aboard stateless vessels and subjects those persons aboard to prosecution for violating the proscriptions." *United States v. Marino-Garcia*, 679 F.2d 1373, 1383 (11th Cir. 1982).

As with other circuits, the Third Circuit does "not embellish the [MDLEA] with a requirement of a nexus between a defendant's criminal conduct and the United States." *See Campbell*, 743 F.3d at 803. "Not only does the MDLEA not impose a nexus requirement, the Fifth Amendment does not require it." *Cuevas-Almonte*, 2024 U.S. Dist. LEXIS 83743, at *12 (citing *Martinez-Hidalgo* at 1056) (citation modified). "[T]he Due Process Clause of the Fifth Amendment does not prohibit a trial and conviction of aliens captured on the high seas while drug trafficking, because the MDLEA provides clear notice that all nations prohibit and condemn drug trafficking aboard stateless vessels on the high seas." *United States v. Valois*, 915 F.3d 717, 722 (11th Cir. 2019) (citing *United States v. Rendon*, 354 F.3d 1320, 1326 (11th Cir. 2003)). Given that binding precedent establishes that no nexus is required, the Court rejects Orr's due process argument.

### F. Federal law prohibits trafficking of marijuana.

---

[30] See also *United States v. Perez-Oviedo*, 44 V.I. 353, 281 F.3d 400, 402-03 (3d Cir. 2002) (reaffirming that a lack of nexus does not violate the due process clause); *United States v. Mena*, 863 F.2d 1522, 1527 (11th Cir. 1989) (rejecting facial challenge to MDLEA based on a lack of a "meaningful relationship" to the United States); *United States v. Stuart-Caballero*, 686 F.2d 890, 891 (11th Cir. 1982) (per curiam) (rejecting facial challenge to predecessor statute for lack of nexus requirement and collecting cases); *United States v. Suerte*, 291 F.3d 366, 375 (5th Cir. 2002) (determining that "to the extent the Due Process Clause may constrain the MDLEA's extraterritorial reach, that clause does not impose a nexus requirement"); *United States v. Cabezas-Montano*, 949 F.3d 567, 587 (11th Cir. 2020) ("[T]he MDLEA is a valid exercise of Congress's power under the Felonies Clause as applied to drug trafficking crimes without a 'nexus' to the United States.") (citations omitted); *Cardales*, 168 F.3d at 553 (holding "that due process does not require the government to prove a nexus between a defendant's criminal conduct and the United States in a prosecution under the MDLEA when the flag nation has consented to the application of United States law to the defendants"); *Marino-Garcia*, 679 F.2d at 1379 (finding that the MDLEA on its face, "does not require that there be a nexus between stateless vessels and the United States but instead extends this country's jurisdiction to all such vessels); *Gonzalez*, 776 F.2d at 938-41 (concluding that there was no due process violation when predecessor statute provided clear notice that drug trafficking aboard vessels was prohibited and conduct prohibited was condemned by all nations).

At the omnibus hearing, counsel for Orr proffered—without supporting authority—that "the United States no longer treats marijuana the same as cocaine or other narcotics." And that "we have entered a time that marijuana is generally lawful."

To be extremely clear: the trend of legalization of marijuana does not change the federal prohibitions of it. *See United States v. Benjamin*, No. 2017-0010, 2018 U.S. Dist. LEXIS 217718, at *4 n.4 (D.V.I. Dec. 30, 2018) ("The [Controlled Substance Act] establishes federal drug policy under which the manufacture, importation, possession, use, and distribution of certain substances—including marijuana—is regulated. 21 U.S.C. § 812."). [31] Marijuana is an illicit drug and a controlled substance under federal law, and the Coast Guard's authority "stems from the MDLEA, which criminalizes certain drug trafficking activity 'committed outside the territorial jurisdiction of the United States,' 46 U.S.C. § 70503(b), and unilaterally confers the United States with jurisdiction to prosecute such conduct, *id.* § 70502(c)." *McElroy-Carlos,* 2023 U.S. Dist. LEXIS 117789 at *4 (citing *Mendoza*, 2022 U.S. App. LEXIS 5954, at *1). There is no question that trafficking of marijuana is properly prosecuted under the MDLEA.

### III.    CONCLUSION

Orr's motion raises multiple arguments previously addressed by this Court and others, relying heavily upon a vacated panel opinion that this Court previously found holds zero persuasive value. For these reasons and others discussed above, Orr's motion is denied.

An appropriate Order follows.

**Dated:** January 22, 2026

/s/ *Robert A. Molloy*
**ROBERT A. MOLLOY**
**Chief Judge**

---

[31] *See also Zimmerman v. Health Network Labs., L.P.*, No. 5:24-cv-01142, 2025 U.S. Dist. LEXIS 24589, at *9 (E.D. Pa. Feb. 10, 2025) ("Despite the increasing number of people registered as medical marijuana 'patients,' marijuana remains illegal under federal law."); *United States v. Attisano*, No. 20-354, 2021 U.S. Dist. LEXIS 163386, at *6 (W.D. Pa. Aug. 30, 2021) (finding the Supreme Court's interpretation of the Controlled Substance Act does not permit use of medical marijuana under federal law); *see also Gonzales v. Raich*, 545 U.S. 1, 29 (2005) ("The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail.").